# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FULCRUM FINANCIAL ADVISORS, LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 02 C 7218 |
| v. ) | |
| ) | Magistrate Judge Morton Denlow |
| BCI AIRCRAFT LEASING, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case involves a claim for breach of contract and *quantum meruit* brought by Plaintiff Fulcrum Financial Advisors, Ltd. ("Plaintiff" or "Fulcrum") against Defendant BCI Aircraft Leasing, Inc., ("Defendant" or "BCI"), arising out of a contract to acquire aircraft refinancing for Defendant. The Court conducted a bench trial on January 10-11, 2005. The Court has considered the testimony of the four witnesses who testified at the trial, the parties' trial exhibits, the written submissions and closing arguments of counsel. The following constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

# I. ISSUES PRESENTED

1. Did Plaintiff arrange financing for Defendant in accordance with the November 20, 2000 engagement letter?

ANSWER:   Yes.

2. Did Defendant breach the engagement letter by failing to pay any fee to Plaintiff?

ANSWER:   Yes.

3. How much is owed to Plaintiff from Defendant arising out of the breach of the engagement letter?

ANSWER:   $120,660 (3% of $4,022,000) plus $40,015.70 in interest (9% from May 22, 2001).

4. In the alternative, is Plaintiff entitled to recover under a theory of *quantum meruit* for the services it rendered to Defendant in connection with the Transamerica refinancing?

ANSWER:   Yes.

5. How much is owed to Plaintiff from Defendant based on its claim for *quantum meruit*?

ANSWER:   $120,660 (3% of $4,022,000) plus $40,015.70 in interest (9% from May 22, 2001).

# II. FINDINGS OF FACT

## A.    THE PARTIES.

1. Fulcrum is a corporation organized under New York law with its principal place

of business in New York, New York. Fulcrum is involved in the business of raising financing and trading secondary debt for the airline industry. T.33-4[1]. Thomas Pickens ("Pickens") and Alfred C. Jones ("Jones") are Managing Directors of Fulcrum. They both testified at the trial. T.33-169. They are both experienced in their fields, they conducted themselves professionally in this transaction, and their testimony was credible and persuasive.

2. BCI is a corporation organized under Illinois law with its principal place of business in Naperville, Illinois. BCI is in the business of financing airplanes. Brian Hollnagel ("Hollnagel") is BCI's President and Founder and Craig F. Papayanis ("Papayanis") is BCI's Managing Director and Chief Financial Officer. They both testified at the trial. T.171-258.

**B. THE ENGAGEMENT LETTER AND AMENDMENT.**

3. BCI purchased two Boeing 737-200 aircraft leased to Varig Airlines ("Varig") in August, 2000. Varig is Brazil's largest commercial airline. The purchase was financed in part by a bridge loan from Coast Business Credit that became due in May, 2001. T.173. The original amount of the bridge loan from Coast Business Credit was $3.9 million, and by November, 2000, this was paid down to $3.3 million. PX1. The lease contains a schedule of monthly rent payments payable by Varig to BCI through October, 2002. PX2.

4. BCI was attempting to refinance the bridge loan, but found that banks did not wish

---

[1]T. refers to transcript cites and PX_ and DX_ refer to Plaintiff's and Defendant's trial exhibits.

to assume the Varig credit risk. T.208-09; PX2. As a result, BCI began to contact other possible financing sources.

5. BCI's Chief Financial Officer, Papayanis, had known Jones for over 14 years. T.74, 209. Papayanis contacted Jones in October, 2000 to see if Fulcrum could be helpful in finding a lending source to refinance the bridge loan on a longer term basis. T.74-5. Jones discussed this matter with his partner, Pickens, who had 25 years of experience in aircraft financing. T.34-5. Jones provided Pickens with information regarding the aircraft, which would become the primary security for the loan along with the lease. T.38-40; PX1.

6. Using this information, Pickens put together a term sheet and approached approximately 17 different lending sources including hedge funds, banks, and asset based lenders to gauge their interest. T.43-7; PX4. He discovered a difficult financing environment because of the Brazilian credit risk and the age of the aircraft. T.47-8. Three lenders did express an interest in pursuing the financing including two hedge funds and one finance company. T.48-9. At the time of the original term sheet there were 22 lease payments still due on the loan. T.54; PX4. By the time the loan eventually closed in May, 2001, there were only 14 lease payments due. T.54.

7. Between November 17 and November 20, 2000, Papayanis and Jones negotiated the terms of an engagement letter with respect to the refinancing. T.76-82; PX6, 7, 10. On November 20, 2000, the parties entered into a non-exclusive engagement letter by which BCI appointed Fulcrum as its advisor in arranging the placement of the debt financing with no

4

more than three prospective lenders of "two (2) Boeing 737-200 aircraft owned by BCI Aircraft Leasing, Inc., bearing respective manufacturer's serial numbers 21002 and 22504." PX10, p. 1. ("Engagement Letter"). Fulcrum was required to identify the prospective lenders to BCI within 24 hours of executing the Engagement Letter. *Id.* BCI was to receive "directly out of the proceeds or consideration received upon the successful arrangement of the Financing, a one-time placement fee equal to 3.0% of the Financing amount." *Id.*, p.2. This payment obligation survives the termination or expiration of the agreement. *Id.* The placement fee was to be paid on the closing date by BCI. New York law applies. *Id.* The Engagement Letter was to expire on January 31, 2001. *Id.*

8. On November 21, 2000, Jones sent Papayanis a letter identifying three prospective lenders including Transamerica Equipment Finance Services ("Transamerica"). T.82; PX11. Fulcrum promptly followed up with Transamerica to move the refinancing forward. PX12 and 14.

9. Once BCI learned that Transamerica was one of the three prospective lenders, Papayanis notified Jones that BCI had a long standing relationship with Transamerica and requested that the Engagement Letter be amended to limit Fulcrum's entitlement to a fee to only this transaction with Transamerica. T.84-6; PX13. Jones acceded to this request and on November 27, 2000, the parties amended the Engagement Letter. T.86; PX15. The amendment provided in relevant part that "any fee payable with respect to a transaction consummated between BCI and Transamerica shall be limited to the financing with respect

to the aircraft specified in the Engagement Letter." PX15.

## C.    THE TRANSAMERICA REFINANCING.

10. Jones worked closely with Papayanis in arranging the Transamerica refinancing. Jones facilitated the flow of necessary information between BCI and Transamerica, he helped to negotiate financing proposals from Transamerica, and he advised Papayanis on the possible structure of the refinancing. T.92-107, 110-14; PX12,14, 16-25. This transaction was heavily negotiated and Jones performed all of the duties expected of Fulcrum under the Engagement Letter. T.143, 149-53, 189.

11. On February 12, 2001, Transamerica forwarded to BCI a loan proposal that appeared to be acceptable to BCI. PX21. Under the terms of the $5,037,022.15 loan proposal, Fulcrum would have received at closing a 3% fee of approximately $150,000.

12. Prior to accepting the Transamerica proposal, Papayanis and Hollnagel called Jones on February 14, 2001, in an effort to renegotiate the fee down to $50,000. T.107-10. Hollnagel acknowledged receipt of the February 12 proposal from Transamerica and indicated he would like to go forward. T.108. Hollnagel falsely represented to Jones that he had other lenders in the wings and that he was prepared to proceed with Transamerica only if Fulcrum would reduce its fee to $50,000. T.108, 211. Jones became quite angry and upset and said that he would have to discuss the matter with Pickens. T.108-9. After discussing the matter with Pickens, Jones called Hollnagel to say that Fulcrum would reluctantly agree to accept a reduction in their fee to $50,000, but only on the condition that

their fee be paid at closing; otherwise their fee would remain at 3% of the financing amount. T.51-2, 108-10. Jones' version of these conversations was credible, whereas Hollnagel's testimony was not credible. Hollnagel believed the conversation took place on March 7. T.238. He believed Papayanis spoke to Jones, and then he could not recall. *Id.* He then stated that he was involved in the call. T.238-42. He presented himself as the type of person who says what is convenient at the time. Hollnagel would also have this Court believe that he would not have gone forward with the Transamerica deal if Fulcrum had not agreed to a reduction in its fee. T.240-41. That is ludicrous in light of the difficulties BCI was experiencing in finding a lender, and the fact that the Coast Business Credit loan was payable in May. Despite Papayanis' acknowledgment that Jones assisted in the Transamerica transaction after March, Hollnagel continued to assert that Jones had no role. T.220. Hollnagel delegated responsibilities to Papayanis, but kept the decision to refuse to pay BCI to himself. Hollnagel acted in bad faith in this transaction by refusing to pay Plaintiff any fee at the closing and by misrepresenting to Jones that he would not proceed with Transamerica unless Fulcrum reduced its fee.

13. On February 16, 2001, Jones advised Transamerica that BCI had informed him that "there appears to be a real risk that BCI will finance the transaction elsewhere." T.110-11; PX23. This is consistent with the representation made by Hollnagel to Jones on February 14.

14. The negotiations between BCI and Transamerica continued until March 6, 2001,

at which time BCI forwarded an executed commitment letter to Transamerica. T.110-14; PX25. After that point, BCI and Transamerica directed their attorneys to prepare the necessary loan documents to close the refinancing on March 30, 2001. T.179. In connection with the closing, Jones sent an invoice to BCI in the amount of $50,000 for payment at the closing. T.116-17; PX27.

15. On March 29, Varig reported a loss of $83 million for 2000. DX13. As a result, Transamerica pulled back from immediately closing the loan. T.117. Thereafter, Jones and Papayanis made numerous calls to Transamerica in an effort to put the financing back on track. T.118-23, 182-83. Papayanis consulted with Jones concerning a variety of issues in an attempt to satisfy Transamerica and to hold the deal together. T.123-28; PX 28-30. As a result of BCI's and Fulcrum's joint efforts, Transamerica agreed to proceed with the refinancing. *Id.* T.206-08. BCI and Transamerica used the same term sheet and loan documentation, except for changes in the economic terms, to close the loan in May rather than in March. T.199-200.

16. On May 22, 2001, the closing took place without Fulcrum's knowledge. T.128-29, 159; DX5. The closing took place with respect to the two Boeing aircraft identified in the Engagement Letter. T.164; DX5. In the Loan Agreement, BCI expressly represented that it owed Fulcrum $50,000 as a broker's commission. T.137; DX5, p. 13. This provision was placed into the loan documents by Papayanis. T.201. Hollnagel's testimony that he signed the loan agreement without reading it and that the provision regarding Fulcrum's fee was an oversight is also not credible. T.246-48. Papayanis was clearly embarrassed that Plaintiff

did not receive its fee. T.201. He disclaimed responsibility for the fee not having been paid. *Id.*

## D.    BCI FAILS TO PAY COMMISSION.

17. BCI did not pay any fee to Fulcrum. Fulcrum pursued payment and was referred to Hollnagel. On June 6, 2001, Hollnagel told Jones that BCI would be paid out of funds received by Coast Business Credit. T.130. No payment was ever made. T.131.

18. Fulcrum substantially performed all of the services required of it under the Engagement Letter.

19. BCI received $4,022,000 in consideration from Transamerica as a result of the loan procured by Fulcrum pursuant to the Engagement Letter. T.131; DX5.

20. Fulcrum is entitled to a 3% placement fee pursuant to the Engagement Letter.

21. In the alternative, Fulcrum is entitled to a 3% placement fee as a reasonable fee for the services it rendered to BCI in procuring $4,022,000 in consideration for BCI from Transamerica.

## III. CONCLUSIONS OF LAW

## A.    JURISDICTION.

22. This Court has diversity jurisdiction. 28 U.S.C. §1332(a)(1). Section 1332(a)(1) provides federal courts with jurisdiction over all civil cases where the matter in controversy is in excess of $75,000.00 and is between citizens of different states. In this case, the parties are citizens of different states but the Defendant disputes whether the controversy involves in excess of $75,000.00. The parties have consented to magistrate judge jurisdiction to preside over this case pursuant to 28 U.S.C. § 636(c)(1).

23. The amount in controversy is "whatever is required to satisfy the plaintiff's demand, in full, on the date the suit begins." *Hart v. Schering-Plough,* 253 F.3d 272, 274 (7th Cir. 2001). Courts must focus their analysis on the plaintiff's own evaluation of its case and need only find that the plaintiff made a good faith claim in excess of $75,000.00 in order to create federal jurisdiction. *Herremans v. Carrera Designs,* 157 F.3d 1118, 1121 (7th Cir. 1998), *citing St. Paul Mercury Indem. Co. v. Red Cab Co.,* 309 U.S. 283, 288-89 (1938).

24. Fulcrum did make a good faith claim in excess of $75,000. Pursuant to the Engagement Letter, Fulcrum claims that it was entitled to a 3% commission ($120,660.00) on the consideration received by BCI, plus interest. Accordingly, the Court has subject matter jurisdiction to decide the case on the merits.

25. As per the parties agreement, New York law applies in this case. PX10.

**B.      BREACH OF CONTRACT CLAIM.**

26. Under New York law, a breach of contract claim has four elements: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Ledain v. Town of Ontario,* 746 N.Y.S.2d 760, 763 (N.Y. Sup. Ct. 2002). Regarding the first element, whether there is a contract, the Court finds that the Engagement Letter signed by the parties on November 20, 2000, constitutes a valid and binding contract. Although the Engagement Letter stated that unless it was renewed, it would expire on January 31, 2001, the behavior of both parties after that date constituted a mutual understanding of the continued validity of the Engagement Letter. The facts demonstrate that

Fulcrum continued to work with Transamerica and BCI on the financing as required by the terms of the Engagement Letter until the final financing agreement with Transamerica was established. In addition, the payment obligation survived the termination or expiration of the agreement.

27. Regarding the second element, performance, the Court finds that Fulcrum performed all five of its obligations under the terms of the Engagement Letter. The first requirement was that Fulcrum would provide a structure for the transaction. All of the proposals submitted to BCI by Transamerica follow the structure of the basic term sheet prepared by Fulcrum. The structure that Fulcrum proposed is a monetization of the lease stream, and that is the structure of the final agreement between Transamerica and BCI. The second requirement was that Fulcrum would identify prospective lenders within twenty-four hours of when the Engagement Letter was executed. On November 21, 2000, within 24 hours of the Engagement Letter's execution, Fulcrum identified three prospective lenders, including Transamerica. The third requirement was that Fulcrum would review the transaction and other operative documents. Fulcrum reviewed the transaction at all stages, including the financing proposals from Transamerica. Of the three written proposals submitted to BCI by Transamerica, two were not accepted by BCI. Fulcrum continued to negotiate with Transamerica, and BCI signed Transamerica's third proposal, which was the model for the documents eventually used at the closing. The fourth requirement was that Fulcrum would market the financing on terms acceptable to BCI. There was a significant

amount of communication between Fulcrum, Transamerica, and BCI about the terms submitted to BCI by Transamerica. Fulcrum marketed the financing on the terms that BCI suggested, and each time Transamerica proposed terms that were not acceptable to BCI, Fulcrum continued to pursue financing on terms that BCI would find acceptable. This communication is evidenced both in Fulcrum's phone records, which show 57 phone calls from Mr. Jones to BCI between March 29 and May 23, 2001, and also in documentary evidence that shows BCI incorporating advice from Fulcrum in its negotiations with Transamerica. Finally, the fifth requirement was that Fulcrum would assist in negotiating and closing the financing. As demonstrated above, Fulcrum assisted BCI in negotiating and closing the financing in a timely manner and to the extent requested by BCI. The fact that Fulcrum was not present at the closing is not relevant to whether Fulcrum performed under the requirements of the contract; the evidence shows that the only reason Fulcrum did not attend the closing was because the closing took place without Fulcrum's knowledge.

28. Regarding the third element, breach, the Court finds that BCI breached the parties' agreement when it failed to pay Fulcrum at the closing of the Transamerica financing. Although BCI contends that Fulcrum was not entitled to a fee because Fulcrum was not responsible for the financing that closed, and that the financing was for a different amount than BCI hoped to receive, the Court rejects these arguments. Contrary to BCI's contentions, the terms of the Engagement Letter provided that Fulcrum was to arrange "debt financing for two (2) Boeing 737-200 aircraft owned by BCI Aircraft Leasing, Inc., bearing

respective manufacturer's serial numbers 21002 and 22504 and currently subject to lease with [VARIG]." PX10. The Transamerica financing that BCI obtained was for the aircraft identified in the Engagement Letter. The fact that the amount of the financing was less than BCI hoped to obtain is immaterial, as the Engagement Letter does not define the amount or terms of the financing that Fulcrum was to arrange. The Engagement Letter specifically provides that BCI "shall have the sole option whether or not to proceed with the financing" and that "[i]n the event BCI chooses not to proceed with such financing, no fee shall be due [to Fulcrum]." PX10. BCI elected to proceed with the Transamerica financing that Fulcrum arranged and, accordingly, BCI breached the agreement when it failed to pay Fulcrum at the closing.

29. Regarding the fourth element, damages, it is clear that Fulcrum suffered damages by fulfilling the terms of the Engagement Letter without the agreed-upon compensation. The heart of this dispute is the amount of Fulcrum's fee. Under the terms of the Engagement Letter, Fulcrum is entitled to 3% of the amount financed, but there was also some discussion between the parties about reducing Fulcrum's fee to $50,000. The issue is whether this discussion was an enforceable modification to the Engagement Letter. Fulcrum claims that it agreed to accept a reduced fee, but only if the fee was paid at the closing, based upon BCI's representation that it had another lender willing to provide financing, and that BCI would proceed with the other lender if Fulcrum did not agree to accept a reduced fee. BCI, on the other hand, claims that Fulcrum agreed to reduce its fee to $50,000 without any

conditions.

30. Under New York law, a modification to an agreement may be made orally or in writing. If made orally, there must be consideration for the modification. N.Y. Gen. Oblig. Law § 5-1103. In this case, there is not an enforceable oral modification of the Engagement Letter as to the terms of the fee because the Defendant gave no consideration for the decreased fee. *See Tierney v. Capricorn Investors*, L.P., 592 N.Y.S.2d 700, 703 (N.Y. App. Div. 1993) (holding that an alleged oral modification of a written employment agreement was not enforceable because the employee's action in remaining on the job did not constitute adequate consideration). Although at the time of their February 14, 2001 conversation Hollnagel told Jones that he had other lenders waiting to finance the aircraft, this was untrue. Because the supposed consideration did not actually exist, there was not an oral modification.

31. However, under New York law, no consideration is required if the modification is in writing and is signed by the party against whom it is sought to be enforced. N.Y. Gen. Oblig. Law § 5-1103. BCI argues that a modification (for a decreased fee of $50,000) was put in writing and signed by Fulcrum in a letter and invoice that Fulcrum sent to BCI on March 29, 2001. Even if this is true, however, this Court will not enforce such a modification because it was made in bad faith and based upon a blatant misrepresentation by the Defendant. *See Pease & Elliman, Inc. v. Stewart*, 270 N.Y.S.2d 324, 326 (N.Y. Civ. Ct. 1965) (holding that even if an indemnity agreement could fairly be construed as protecting against a claim, it was unenforceable for such a purpose under the doctrine that a court will not lend its aid to one who bases his cause of action upon his own wilful and deliberate,

tortious acts). Under general contract principles, it is well established that a contract is void and unenforceable if procured through fraud. *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229 (10th Cir. 1999); Restatement (Second) of Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."). In this case, any modification as to the payment terms was procured by a material misrepresentation by BCI and will not be enforced by this Court.

32. Further, New York law imposes a duty of good faith and fair dealing in every contract. *Nat'l Market Share, Inc., v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir. 2004) (interpreting New York law). This covenant of good faith and fair dealing is breached when a party to a contract acts in a manner that, while not expressly forbidden by any contractual provision, will deprive the other party of the right to receive the benefits under their agreement. *Jaffe v. Paramount Communications Inc.*, 644 N.Y.S.2d 43, 47 (N.Y. Gen. Term 1996). New York law recognizes that, under appropriate circumstances, an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied, enforced. *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, (N.Y. 1983). In this case, the Court enforces the implied obligation of good faith and fair dealing found within the Engagement Letter and awards Fulcrum the original fee of 3%. BCI breached the duty of good faith and fair dealing when it sought to renegotiate the fee based on a material misrepresentation.

## C.  QUANTUM MERUIT CLAIM.

33.  *Quantum meruit* is an equitable doctrine recognized in New York.  *See Niagra Mohawk Power v. Freed,* 696 N.Y.S.2d 600 (N.Y. App. Div. 1999) (describing the doctrine as equitable); *Meyers v. Town of Coxsackie,* 527 N.Y.S.2d 584, 585 (N.Y. App. Div. 1988) (noting it is well settled that a plaintiff has the right of election to maintain an action on the breach of a contract or to abandon any claim on the contract and sue on *"quantum meruit* for the work, labor and services performed and material furnished").

34.  New York courts have awarded *quantum meruit* to service providers, including financial companies.  *See Van Diepen v. Kidder,* 665 N.Y.S.2d 267 (N.Y. App. Div. 1997). While the *Meyers* decision provides plaintiffs with a right of election on whether to pursue a claim under a breach of contract theory or under a *quantum meruit* theory, New York law generally precludes recovery in *quantum meruit* in cases where there is a valid, written and enforceable contract.  *Aviv Const. v. Antiquarium,* 687 N.Y.S.2d 344, 345 (N.Y. App. Div. 1999).  A plaintiff may, however, pursue both breach of contract and *quantum meruit* claims when there is a bona fide dispute over whether a contract exists or whether an existing contract covers the dispute.  *Curtis Props. v. Grief Cos.,* 653 N.Y.S.2d 569, 571 (N.Y. App. Div. 1997).

35.  Defendant disputes that the ultimate loan with Transamerica was subject to the Engagement Letter, because it claims that it was a new and separate transaction. Accordingly, Fulcrum may pursue both a breach of contract claim and an alternative *quantum meruit*

claim.

36. To prevail on *quantum meruit*, a plaintiff must prove "(1) the performance of services in good faith, (2) the acceptance of the services by the person for whom they were rendered, (3) an expectation of compensation, and (4) the reasonable value of the services performed." *Precision Founds. v. Ives*, 772 N.Y.S.2d 116, 118 (N.Y. App. Div. 2004).

37. As previously discussed in the findings of fact and the breach of contract portion of this opinion, Fulcrum has performed the services in good faith satisfying the first element. BCI incorporated much of Fulcrum's work in the final refinancing deal with Transamerica, thus accepting Fulcrum's services and satisfying the second element. Pursuant to the Engagement Letter, Fulcrum was entitled to 3% of the total refinancing. At all times, BCI was aware that Fulcrum expected to be paid for its work. Thus, Fulcrum's expectation of compensation satisfies the third element.

38. To prove the "reasonable value of services," a plaintiff may present evidence as to the value the parties placed on such services in a previous or canceled contract. *Revson v. Cinque & Cinque*, 221 F.3d 59, 69 (2d Cir. 2000) (applying New York law). In this case, the Plaintiff presented evidence that the parties had agreed upon 3% of the total refinancing as a reasonable value for Fulcrum's services. While relevant to the determination of the reasonable value for services, the ultimate calculation of this amount is made by the fact-finder. *Longo v. Shore & Reich*, 25 F.3d 94, 98 (2d Cir. 1998). As indicated in the findings of fact, this Court finds the reasonable value of Fulcrum's services to be $120,660.

39. Therefore, the Court concludes that, in the alternative, BCI owes $120,660 in

*quantum meruit* for its services.

## D.    INTEREST

40. In addition to its fee, Fulcrum is entitled to interest on the fee under both breach

of contract and quantum meruit.

### *1.    Interest for the Breach of Contract Claim*

41. Under New York law, "[i]nterest shall be recovered upon a sum awarded because

of a breach of performance of a contract...." N.Y. C.P.L.R. § 5001(a). "The purpose of

awarding interest is to make an aggrieved party whole." *Spodek v. Park Prop. Dev. Assoc.,*

96 N.Y.2d 577, 581 (N.Y. 2001). The rationale for this approach was explained by Chief

Justice Cardozo in *Prager v. New Jersey Fid. & Plate Glass Ins. Co.,* 245 N.Y. 1, 5-6 (N.Y.

1927), and is equally relevant today:

> While the dispute as to value was going on, the defendant had the benefit of the
> money, and the plaintiff was without it. Interest must be added if we are to make the
> plaintiff whole. * * * If [defendant] chose to keep the money, it should pay for what
> it kept. There would be obvious injustice if interest would be lost as the result of a
> slight discrepancy between the claim and the award.

*Id.* In this case, BCI had the benefit of the money while the dispute was going on, and it

would be an injustice to withhold interest on the money that Fulcrum is entitled to under the

terms of the Engagement Letter.

42. "Interest shall be computed from the earliest ascertainable date the cause of action

existed...." N.Y. C.P.L.R. § 5001(b). "Under New York law, 'prejudgment interest is

normally recoverable as a matter of right in an action at law for breach of contract'."

*Donovan v. Dairy Farmers of Am.*, 53 F.Supp.2d 194, 197 (N.D. N.Y. 1999), *quoting Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir. 1984) (interpreting New York law). Interest is calculated "at the rate of nine per centum per annum, except where otherwise provided by statute." N.Y. C.P.L.R. § 5004. Accordingly, Fulcrum is entitled to recover prejudgment interest from BCI from May 22, 2001, the date of BCI's breach of the Engagement Letter, through January 26, 2005, the date of judgment, at a rate of 9 percent per annum.

43. In this case, damages are $120,660. Simple interest at 9 percent per annum from May 22, 2001, the date of the breach, until January 26, 2005, the date of judgment, totals $40,015.70. Therefore, the total amount due to Fulcrum from BCI is $160,675.70.

## 2.    *Interest for the Quantum Meruit Claim*

44. Under New York law, courts may, at their discretion, award interest on equitable claims. N.Y. C.P.L.R. § 5001(a).

45. While New York courts have long recognized *quantum meruit* as a valid equitable doctrine, they are split on whether the doctrine falls under the equity exception to the interest provision. *Compare Aniero Concrete Co. v. N.Y. City Constr. Auth.*, 308 F.Supp.2d 164, 211 (S.D.N.Y. 2003) ("While ... the roots of *quantum meruit* are found in principles of equity, for purposes of prejudgment interest the remedy is likened to one for breach of contract, and an award of prejudgment interest is *mandatory.*") *and Ogletree v. Albany Steel*, 663 N.Y.S.2d 313, 315 (N.Y. App. Div. 1997) ("Plaintiff's quantum meruit action is essentially an action

19

at law, inasmuch as it seeks money damages in the nature of a breach of contract, "notwithstanding that the rationale underlying such causes of action is fairness and equitable principles in a general rather than legal, sense.") *with Precision Founds.,* 772 N.Y.S.2d at 120 ("Turning to Supreme Court's award of preverdict interest to plaintiff, we note that such awards are *discretionary* for a quantum meruit claim.").

46. In the exercise of discretion, this Court awards Fulcrum prejudgment interest at 9% per annum from the closing date of May 22, 2001 through the date of judgment under its *quantum meruit* claim

## V. CONCLUSION

For the foregoing reasons, Plaintiff Fulcrum Financial Advisors, Ltd., is entitled to damages from Defendant BCI Aircraft Leasing, Inc., for breach of contract in the amount of $120,660.00, plus interest in the amount of $40,015.70. In the alternative, Plaintiff is entitled to damages from Defendant in the amount of $120,660.00, plus interest in the amount of $40,015.70, on its claim for *quantum meruit.*

**Judgment is hereby entered in favor of Plaintiff Fulcrum Financial Advisors, Ltd., and against Defendant BCI Aircraft Leasing, Inc., in the total amount of $160,675.70 under Count I (breach of contract) and alternatively, in the total amount of $160,675.70 under Count II (quantum meruit) of its complaint. The judgment under Count II is not in addition to the judgment under Count I. Plaintiff, as the prevailing party, is also entitled to recover its court costs against Defendant.**

**SO ORDERED THIS 26th DAY OF JANUARY, 2005.**

_____
**MORTON DENLOW**
**United States Magistrate Judge**

**Copies Mailed To:**

Michael H. Moirano
Nisen & Elliott
200 West Adams Street
Suite 2500
Chicago, IL 60606
Attorney for Plaintiff

Christopher C. Osborne
BCI Aircraft Leasing, Inc.
330 N. Wabash
Suite 2802
Chicago, IL 60611
Attorney for Defendant